**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

TANISHA STONE, for E.L.,

                Plaintiff,

vs.

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

                Defendant.

CASE NO. 1:21-CV-01446

MAGISTRATE JUDGE AMANDA M. KNAPP

**<u>MEMORANDUM OPINION AND ORDER</u>**

       Plaintiff Tanisha Stone ("Plaintiff" or "Ms. Stone") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying the application of her minor child, E.C.L., for Supplemental Security Income ("SSI").  (ECF Doc. 1.) This matter is before this Court by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF Doc. 8.)

       For the reasons set forth below, the final decision of the Commissioner is **VACATED** and that the case be **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Memorandum Opinion and Order.   On remand, the ALJ should consider the record as a whole in assessing whether E.C.L. functionally equals the listings, should accurately discuss the probative evidence, should resolve any conflicts in evidence, and should ensure that he builds an accurate and logical bridge between the evidence and the result.

1

## I. Procedural History

On August 11, 2017, Ms. Stone filed an application for SSI on behalf of her minor child, E.C.L., alleging a disability onset date of January 1, 2010.  (Tr. 93.)  She alleged disability due to PTSD and ADHD.  (*Id.*)  Ms. Stone's application was denied at the initial level (Tr. 103) and upon reconsideration (Tr. 117), and she requested a hearing (Tr. 163-65).  On October 22, 2019, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 185-203.)

On November 5, 2019, the ALJ issued a decision finding that E.C.L. had not been under a disability within the meaning of the Social Security Act from August 11, 2017 through the date of the decision.  (Tr. 118-39.)  Ms. Stone objected to the determination and requested review of the hearing decision.  (Tr. 212-14.)  On July 28, 2020, the Appeals Council remanded the case for further consideration of severe impairments and proper evaluation of the opinions of the State Agency medical consultants.  (Tr. 140-45.)

On November 24, 2020, a second hearing was held before an ALJ.  (Tr. 29-46.)  On January 8, 2021, the ALJ issued a second decision finding that E.C.L. had not been under a disability within the meaning of the Social Security Act from August 11, 2017 through the date of the decision.  (Tr. 13-23.)  On May 28, 2021, the Appeals Council denied Ms. Stone's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)

On July 27, 2021, Ms. Stone filed a Complaint challenging the Commissioner's final decision.  (ECF Doc. 1.)  The parties have completed briefing in the case.  (ECF Docs. 11, 13.)

## II. Evidence

### A.   Personal, Educational, and Vocational Evidence

E.C.L. was born in 2007, was a school-aged child under Social Security Regulations on the date the application was filed, and is currently an adolescent.  (Tr. 13.)  E.C.L. had not worked since August 11, 2017, the application date.  (*Id*.)

### B.   Medical Evidence

Ms. Stone's sole assignment of error relates to the functional domain of caring for self. (ECF Doc. 11, p. 1.)  The evidence summarized herein is therefore limited to evidence relevant to that domain.

#### 1.   Relevant Treatment History

Treatment notes from Beech Brook state that E.C.L. had a diagnosis of ADHD as early as August 2013.  (Tr. 952.)  At that time, E.C.L. was repeating kindergarten, and "had a significant history of impulsivity, distractibility, hyperactivity, and off-task behavior."  (*Id*.)  He was prescribed Adderall for his ADHD symptoms.  (Tr. 953.)

Beech Brook staff drafted a treatment plan on September 8, 2017 to address E.C.L.'s inability to focus, excessive energy, and decreased impulse control.  (Tr. 955.)  The plan included counseling with Caise McHale, LSW, and medications prescribed by Dr. Thomas Eppright.  (Tr. 955-56.)  Goals included teaching "an array of self-regulation tools."  (Tr. 957.) Medications include Adderall and clonidine.  (Tr. 948, 1095.)

E.C.L. continued to receive treatment at Beech Brook throughout the relevant period.  On December 29, 2017, Beech Book psychiatrist Thomas Eppright, M.D., noted E.C.L. was "making some progress, but still at times has to contain aggression."  (Tr. 948.)  Medications

were adjusted at the conclusion of this visit.  (Tr. 948, 951.)  E.C.L. continued to take Adderall. (Tr. 951.)  Clonidine had also recently been prescribed, and the dosage was increased.  (*Id.*)

During E.C.L.'s May 29, 2018 therapy appointment at Beech Brook, his mother reported that he was sent home early one day in March for "off task behaviors" and received a 10-day suspension the same month for aggressive behavior towards a para-professional.  (Tr. 1091-92.) The following month, she reported he had received another suspension for fighting with a peer and disrespecting the teacher.  (Tr. 1091.)  LSW McHale met with E.C.L. to process safety, accountability, anger management, and coping skills.  (Tr. 1092.)  One of the goals for his therapy was to "decrease impulsivity" and treatment objective included "client will learn, practice, employ and process the efficacy of at least 3 impulse reduction strategies per teacher, client, therapist, and parent report."  (Tr. 1093.)  LSW McHale noted that "[E.C.L.] struggled with regulation over the past 5 months, primarily from December to April," but had "shown some improvement in the last few weeks."  (Tr. 1094.)  LSW McHale found E.C.L. continued to present with symptoms that met the criteria for Disruptive Mood Dysregulation disorder, with persistent irritable mood often associated with temper outbursts, verbal or physical aggression that occurred three or more times per week, demonstrated across settings.  (*Id.*)  He also continued to meet the criteria for ADHD and needed additional support in school.  (*Id.*) Clonidine and Adderall were continued.  (Tr. 1095.)

At a Beech Brook pharmacology management appointment on October 23, 2018, E.C.L.'s mother reported he was "doing very well" since transferring to a new school, with some irritability, easy frustration, and difficulty with transitions.  (Tr. 1187, 1190.)  Clonidine and Adderall were continued.  (Tr. 1190.)  Beech Brook records indicate these prescriptions remained consistent throughout 2019.  (Tr. 1195, 1274.)

E.C.F. continued to receive behavioral therapy with LSW McHale in 2019 and 2020. (Tr. 1192, 1222, 1238, 1242, 1257, 1261, 1263-64, 1268, 1269.)  Throughout this period, he was working on self-regulation skills.  (Tr. 1221, 1229, 1241, 1245, 1249, 1257, 1261.)  On September 18, 2019, E.C.L. shared that he had received a detention for inappropriate language. (Tr. 1269.)  On November 20, 2019, he reported receiving a one-day suspension for being disrespectful.  (Tr. 1263 (see Tr. 586).)  LSW McHale coached him on breathing, evaluating thinking errors, and the ABC model of behavior, to address impulsive and off-task behaviors. (Tr. 1265.)  She noted E.C.L. "was not able to process fully his goal progress at this session – he was distracted."  (Tr. 1266.)  During his February 2020 visits, it was reported that E.C.L. was again sent home from school and was struggling with emotional regulation in the classroom. (Tr. 1223, 1227.)  LSW McHale noted E.C.L. "has not been able to manage impulsivity at school and to avoid expulsion, his progress will be addressed by intervention team."  (Tr. 1228-29.)  She gave him a sensory box to assist with regulation, visual cues, and a journal in class for writing feelings.  (Tr. 1229.)  LSW McHale worked with E.C.L. on exploring and processing regulation states, regulation tools, and speaking points about his moods (Tr. 1230).  Ms. Stone shared that when he became upset, he couldn't form words, and the frustration of being unable to communicate caused him to act out.  (Tr. 1230.)  E.C.L. stated he would prefer prepared ideas to communicate his needs more easily.  (*Id.*)  On April 23, 2020, after the transition to virtual instruction, he reported struggling with attending his classes and turning in work on time.  (Tr. 1255-56.)  On July 28, 2020, E.C.L. reported a "more balanced mood since school let out" for the summer.  (Tr. 1243.)  He was working on avoiding negative mood outbursts and using coping skills at home.  (Tr. 1251.)

On August 12, 2020, Nurse Practitioner Erin Gooch assessed E.C.L.'s progress.  (Tr. 1212.)  He reported that he intended to continue online schooling and "feels that he will be able to manage this."  (Tr. 1215.)  His mother planned to "stay[] on him with his schoolwork and chores so he gets stuff done."  (Tr. 1215.)

### 2.     Educational Records

On December 4, 2017, an Evaluation Team Report ("ETR") compiled by school psychologist Rachael Folkman noted E.C.L. had received special education services since first grade.  (Tr. 1134.)  E.C.L.'s teacher and his intervention specialist rated his executive functioning weakness as "below average" in flexibility and inhibitory control, and "well below average" in emotional regulation in both the classroom and small group/resource room settings.  (Tr. 1145.)  His classroom teacher stated that when E.C.L. is frustrated, "he often loses control, and his temper escalates quickly."  (Tr. 1150.)

An Individualized Education Plan ("IEP") was completed for E.C.L. on March 16, 2018.  (Tr. 1104.)  Testing documented intellectual abilities and overall performance that were well below average, or in the borderline range.  (Tr. 1105.)  Cognitive deficits were noted in the areas of associative memory, general sequential reasoning, visualization, and spatial relations.  (*Id.*)  Further analysis revealed difficulty with abilities on tasks that required use of meaningful stimuli.  (*Id.*)  It was noted that these abilities are essential for a student to accurately perceive non-verbal cues, gestures, and social interactions.  (*Id.*)  E.C.L. was described as "having a history of difficulty with his emotional regulation, flexibility, defiance/aggression, and inhibitory control skills at school."  (*Id.*)  It was also reported that "[t]hese skills are further impaired by his difficulty with receiving and understanding communication" (*Id.*)

6

The IEP noted that E.C.L.'s behavior problems had increased over the past school year, with gradual loss of recess time due to safety concerns, struggling to be respectful to adults, participating in rude/hurtful/bullying comments, physical aggression with students and staff, and increased noncompliance in the classroom and resource rooms.  (*Id*.)  As a result, E.C.L. had a Functional Behavior Assessment ("FBA") and a Behavior Intervention Plan ("BIP"), reviewed three times during the school year.  (*Id*.)  From August 2017 through November 2017, disciplinary records showed 12 incidents, including failure to comply, use of inappropriate language, demonstrating unsafe behaviors, throwing shoes, refusal to comply, rude and disrespectful behavior toward staff, fighting, and demonstrating aggression toward peers.  (Tr. 1135-38.)  He participated in a social skills group twice a week that was "turned into a one on one session due to his increasing difficulty with managing behavior" around his peers and had "a very structured schedule for movement breaks and transitions" to address his behavior challenges.  (Tr. 1111-12.)

One of E.C.L.'s IEP goals was self-regulation.  (Tr. 1112.)  The IEP noted that E.C.L. received private, outside therapy where he "work[ed] extensively on strategies for him to use to calm himself," but he continued to have difficulty self-regulating his emotional responses to situations and once triggered had only been observed able to calm himself five times the entire school year.  (*Id*.)

E.C.L.'s IEP was reviewed and updated in March 2019.  (Tr. 780-82.)  Regarding the areas of behavior and self-regulation, E.C.L. was identified as needing to improve his ability to adapt to changes in routine, work cooperatively with peers, accept disappointment, follow directions, listen to adults at school in all settings, and follow essential agreements in less structured environments such as recess, lunch, and specials.  (Tr. 782.)  Regarding the area of

self-regulation, the IEP stated E.C.L. continued "to need support to manage his behaviors in all classes … and also when he [wa]s feeling frustrated or angry and may not know how to complete a task." (Tr. 789.) His "self-control during less structured times at lunch, recess, specials and transitions," was described as "problematic" as he was compliant only 45% of the time. (*Id*.) Administrators determined that some actions employed by E.C.L. needed to be met with consequences. (*Id*.) The IEP recommended transportation to and from school by van service door-to-door "to support [E.C.L.'s] self-regulation of his behavior." (Tr. 792.) Records indicate this accommodation was provided beginning March 11, 2019. (Tr. 798.)

On June 4, 2019, Ms. Stone was called to pick E.C.L. up early from school "for a behavioral issue." (Tr. 812.)

A notice of a meeting to sign a BIP dated June 5, 2019, noted E.C.L. had "weak impulse control," which "ended in altercations with other students, detentions, and suspensions." (Tr. 813.) It included the goal of "safe responses when frustrated." (*Id*.)

An IEP and BIP update dated February 28, 2020 stated that, with regard to self-regulation, E.C.L. was "not able to self-regulate independently in order to remain calm and make decision when feeling upset or frustrated," and did "not take ownership of his actions or connect [actions] to the consequences/outcomes of his decisions." (Tr. 843.) School security had to remove him from the classroom three times recently due to disruptive or non-compliant behavior. (Tr. 843.) Recent observations noted: speaking respectfully to others 57% of the time in four out of seven observations; talking out during instruction 71% of the time during five of seven observations; following rules and expectations 28% of the time during hallway transitions in two out of seven observations. (*Id*.) His relevant IEP goals remained to decrease inappropriate verbal comments, demonstrate self-control in the classroom (raising his hand and

8

waiting to be called on), and show self-control of his body and voice (good personal space and appropriate voice level).  (Tr. 843-44.)

Disciplinary school reports show multi-day suspensions during the period between September 2017 and November 2018 for behaviors including a failure to follow directives, fighting, failure to comply, and disrespectful language (Tr. 277-279, 281, 334-338, 585-586).

E.C.L. received multiple disciplinary actions from March 2019 through May 2019 for infractions including walking out of class, refusal to work, calling out in class, not following directions, throwing pencils, rudeness, talking back, falling asleep in class, off-task behavior, resulting in detentions and loss of recess.  (Tr. 701-02, 705-07, 710, 712, 714, 716, 718, 733, 737, 740, 743, 747 (reports of disciplinary infractions).)  He was suspended from May 22-24, 2019 for fighting/violence and disruptive behavior/failure to comply with directives.  (Tr. 663.)

### 3.    Opinion Evidence

#### i.    Function Reports

E.C.L.'s mother completed a function report on May 4, 2018.  (Tr. 296–304.)  With regard to the domain of caring for self, she indicated E.C.L. was not able to wash his hair or choose clothes by himself, and did not pick up and put away toys, hang up clothes, help with chores around the house, do what he was told most of the time, obey safety rules, or accept criticism or correction.  (Tr. 303.)

#### ii.    State Agency Reviewers

On July 14 and 18, 2018, State agency reviewing physician, Milford Schwartz, M.D., and State agency reviewing psychologist Jennifer Swain, Psy.D., jointly opined that E.C.L. had severe impairments of ADHD and ODD.  (Tr. 97.)  They stated that these impairments did not

functionally meet or equal any of the listings of impairments, and assessed the functional
domains as follows:

- no limitation in acquiring and using information, moving about and manipulating objects, and health and physical well-being;

- less than a marked limitation in attending and completing tasks, and caring for self; and

- a marked limitation in interacting and relating to others.  (Tr. 98.)

They noted they were adopting a prior ALJ decision dated August 2, 2017.  (*Id*.).

On October 2018, State agency reviewing physician, Louis Goorey, M.D., and State
agency reviewing psychologist Todd Finnerty, Psy.D., jointly confirmed the opinion of Drs.
Schwartz and Swain, adopting the ALJ decision dated August 2, 2017.  (Tr. 112.)

## C.     Plaintiff's Hearing Testimony

At the November 24, 2020 hearing, Ms. Stone, testified that her son was in seventh grade.
(Tr. 35.)  He had received mental health treatment since the age of six.  (Tr. 41.)  At the time of
the hearing, he was taking Adderall, clonidine, and melatonin, and was involved in weekly
counseling.  (*Id*.)

With regard to the domain of caring for self, Ms. Stone testified that E.C.L. "is
dysregulated a lot," and frequently exhibited behavioral issues including punching walls, hitting
his sister, and breaking windows.  (Tr. 37, 39.)  He needed reminders to attend virtual classes or
brush his teeth, but would become dysregulated when she asked him to do so.  (Tr. 39.)

Before schooling became virtual, Ms. Stone testified she got a lot of calls from E.C.L.'s
school and spent a lot of time at the school to help E.C.L. calm down after he had walked out of
class or argued with teachers.  (Tr. 39-40.)  She stated that E.C.L. engaged in physical fights with
peers that he has been friends with since kindergarten, and that he was unable to stay overnight at

10

friends' houses because he would fight them. (Tr. 40.) He had served multiple suspensions and been removed from the bus as a result of fighting. (Tr. 40, 43-44.) His most recent suspension was just before school became virtual. (Tr. 43-44.) He caused problems with the neighbors by throwing rocks at church windows and picking on other kids. (Tr. 43.) Ms. Stone testified that neighbors had called the police because of his behaviors. (*Id*.)

### III. Standard for Disability

To qualify for SSI benefits, "[a]n individual under the age of 18 shall be considered disabled ... if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). To qualify, a child recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

Social Security regulations prescribe a three-step sequential process to evaluate children's disability claims. 20 C.F.R. § 416.924(a). At step one, a child must not be engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). At step two, a child must suffer from a "severe impairment." 20 C.F.R. § 416.924(c). At step three, disability will be found if a child has an impairment, or combination of impairments, that meets, medically equals or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1; 20 C.F.R. § 416.924(d).

To make the step three determination that a child "meets" a listing, the child's impairment must be substantiated by medical findings shown or described in the listing for that impairment. 20 C.F.R. § 416.925(d). Alternately, to make a step three determination that a child "medically equals" a listing, the child's impairment must be substantiated by medical findings at least equal in severity and duration to those shown or described in the listing for that impairment. 20 C.F.R.

§ 416.926(a).  Finally, to make a step three determination that a child "functionally equals" a

listing, the impairment must be found to be "of listing-level severity," meaning that it will "result

in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain."

20 C.F.R. § 416.926a(a).  The relevant six domains of functioning to be considered are: (1)

acquiring and using information; (2) attending and completing tasks; (3) interacting and relating

with others; (4) moving about and manipulating objects; (5) caring for herself/himself; and (6)

health and physical well-being.  20 C.F.R. § 416.926a(b)(1)(i)-(vi).

### IV. The ALJ's Decision

In his January 8, 2021 decision, the ALJ made the following findings:[1]

1.  The claimant was born in 2007. Therefore, he was a school-age child on August
    11, 2017 the date the application was filed, and is currently an adolescent.  (Tr. 13.)

2.  The claimant has not engaged in substantial gainful activity since August 11, 2017
    the application date. (*Id.*)

3.  The claimant has the following severe impairments: oppositional defiant disorder,
    attention deficit hyperactivity disorder; and mild conductive hearing loss.  (*Id.*)

4.  The claimant does not have an impairment or combination of impairments that meets
    or medically equals the severity of one of the listed impairments in 20 CFR Part 404,
    Subpart P, Appendix 1.  (Tr. 14.)

5.  The claimant does not have an impairment or a combination of impairments that
    functionally equals the severity of the listings.  (*Id.*)

Based on the foregoing, the ALJ determined that E.C.L. had not been under a disability,

as defined in the Social Security Act, from August 11, 2017, through the date of the decision on

January 8, 2021.  (Tr. 23.)

---

[1] The ALJ's findings are summarized.

## V. Plaintiff's Arguments

In her single assignment of error, Ms. Stone asserts the ALJ erred in finding E.C.L. did not satisfy the domain of caring for self in determining non-disability.  (ECF Doc. 11 p. 1.)

## VI. Law & Analysis

### A.     Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992)); *see also Blakley*, 581 F.3d at 406.  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of

13

credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Even where an ALJ decision is supported by substantial evidence, the Sixth Circuit explains the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 546-547 (6th Cir. 2004)); *see also Rabbers*, 582 F.3d at 654 ("Generally, … we review decisions of administrative agencies for harmless error.").  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.**     **Whether ALJ Erred in Assessing Domain of "Caring For Self"**

In her sole assignment of error, Ms. Stone asserts that the "ALJ erred in determining that [E.C.L.] had a less than marked limitation in the domain of caring for himself" due to "the ALJ's selective reading of the record, misunderstanding of the domain itself, and the failure to properly account for the severity of the restrictions identified within the educational assessments and medical records."  (ECF Doc. 11 pp. 11-12.)  The Commissioner argues that the evidence cited by Ms. Stone reflects "descriptions of specific behaviors regarding other people," and thus is

14

relevant to E.C.L.'s impairment in interacting with others, rather than caring for himself.  (ECF Doc. 13 pp. 4-5.)  She asserts that the ALJ properly relied on State agency reviewer opinions which adopted the prior ALJ's RFC finding in this domain because "although there is new evidence since a prior ALJ's decision, none of the new evidence is material."  (*Id*. at 4.)

### 1.    Governing Regulatory Standards

To support a Step Three determination that a child functionally equals a listing, the ALJ must find his impairments are "of listing-level severity," meaning they will "result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a).  Under Social Security regulations, a limitation is "marked" if the impairment "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i).  Marked limitations are also described as limitations that are "'more than moderate' but 'less than extreme'" and "the equivalent of the functioning [the SSA] would expect to find on standardized testing with scores that are at least two, but less than three standard deviations below the mean."  *Id*.

As the Commissioner notes, Social Security Rule ("SSR") 09-7p explains: "The domains of 'Caring for yourself' and 'Interacting and relating with others' are related, but distinct."  (ECF Doc. 13 p. 4, citing SSR 09-7p.)  Caring for yourself focuses on "a child's feelings and behavior in relation to self," and interacting and relating with others focusing on "a child's feelings and behavior in relation to other people." SSR 09-7p, 2009 WL 396029, at *4.[2]  SSR 09-7p recognizes that some impairments may cause limitations in both domains, explaining:

---

[2] SSRs "are binding on all components of the Social Security Administration" and "represent precedent final opinions and orders and statements of policy and interpretations" adopted by the agency. 20 C.F.R. § 402.35(b)(1). While SSRs do not have the force of law, they are an agency's interpretation of its own regulations and "entitled to substantial deference and will be upheld unless plainly erroneous or inconsistent with the regulation." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 498 (6th Cir. 2006).

> For example, a boy with Oppositional Defiant Disorder who refuses to obey a parent's instruction not to run on a slippery surface endangers himself and disrespects the parent's authority.  In this case, the child's mental disorder is causing limitations in the domains of "Caring for yourself" and "Interacting and relating with others."

*Id*.  It further explains:

> Rating the limitations caused by a child's impairment(s) in each and every domain that is affected is not "double-weighting" of either the impairment(s) or its effects.  Rather, it recognizes the particular effects of the child's impairment(s) in all domains involved in the child's limited activities.

*Id*.

In a finding that was not challenged on appeal, the ALJ found E.C.L. has a "marked" limitation in the domain of interacting and relating to others (Tr. 19).  (ECF Doc. 11 pp. 9-10).  Ms. Stone now argues that E.C.L. is entitled to benefits under the functional equivalence standard because the ALJ should also have found E.C.L. had a "marked" limitation in the domain of caring for himself, instead of a "less than marked" limitation (Tr. 15).  (*Id*. at p. 11.)

The domain of caring for self concerns "how well [a child] maintain[s] a healthy emotional and physical state, including how well [they] get [their] physical and emotional wants and needs met in appropriate ways; how [they] cope with stress and changes in [their] environment; and whether [they] take care of [their] own health, possessions, and living area." 20 C.F.R. § 416.926a(k).  School aged children (ages six to twelve) "should begin to demonstrate consistent control over [their] behavior, and [they] should be able to avoid behaviors that are unsafe or otherwise not good for [them]."  20 C.F.R. § 416.926a(k)(2)(iv).  Adolescents (ages twelve to eighteen) "should be increasingly independent in all of [their] day-to-day activities" and "should begin to discover appropriate ways to express [their] feelings, both good and bad." 20 C.F.R. § 416.926a(k)(2)(v).

16

The regulations provide examples of limited function in caring for self, including ignoring safety rules.  20 C.F.R. § 416.926a(k)(3)(iv).  Courts have additionally determined that a child's "inability to control his behavior, to understand acceptable and unacceptable behaviors, and to avoid unsafe or harmful behaviors" should be considered under the domain of caring for self.  *See Abney o.b.o. C.K.S. v. Comm'r of Soc*. Sec., No. 1:20-CV-495, 2021 WL 4451954, at *7-8 (W.D. Mich. Sept. 29, 2021).

### 2. Whether Finding of "Less Than Marked" Limitations Was Supported by Substantial Evidence

The question presented here is whether the ALJ's finding that E.C.L.'s limitations in caring for self were "less than marked" was supported by substantial evidence, and more specifically whether a "selective reading of the record" or "failure to properly account for the severity of the restrictions identified within the educational assessments and medical records" resulted in a lack of substantial evidence to support the finding.  (*See* ECF Doc. 11 pp. 11-15 (citing cases).)

In support of his finding of "less than marked" limitations in the domain of caring for self, the ALJ explained:

> The undersigned finds that the claimant's impairments have interfered with his ability to care for his own needs in an age-appropriate manner as evidenced by the fact the claimant has problems controlling his behavior. However, in the undersigned's opinion, the evidence that has been submitted in this matter does not show that the claimant's ability to care for his own needs has materially worsened since Judge Budney issued her decision on August 2, 2017. Certainly, there is no persuasive evidence showing that the claimant's impairments have caused, over any continuous 12-month period relevant to this decision, marked or extreme limitations in regards to his ability to care for his own needs in an age-appropriate manner. Therefore, like Judge Budney found, the undersigned finds that the claimant's impairments have caused less than marked limitations in terms of his ability to care for his own needs in an age appropriate manner. In support of this determination, the undersigned notes he has considered, and placed significance on, the fact no medical or educational source has said the claimant has been markedly or extremely limited in terms of his ability to care for his own needs in an age-appropriate manner. The undersigned has also taken into consideration the

claimant's mother description of him as being able to control his emotions during his sporting events and when he is around friends outside of school (see again Ex. B11E, p. 20). The claimant has also been described as being better at self-regulating his emotions. He has also been described as being very caring. The claimant can also bathe and dress himself.

(Tr. 21 (emphasis added).)  Later in his decision, in support of his finding that the "less than marked" findings of the State Agency consultants were persuasive, the ALJ further observed: "The claimant is not dysregulated, he complies well, does school tasks, interacts with peers and is a good and kind helper."  (Tr. 23.)

Although the substantial evidence standard is largely deferential, the Sixth Circuit has emphasized that the chief limitation to that deference "is the requirement that all determinations be made based upon the record in its entirety."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007) (citing *Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984)).  The court explained: "This requirement that determinations be made in light of the record as a whole helps to ensure that the focus in evaluating an application does not unduly concentrate on one single aspect of the claimant's history."  *Rogers*, 486 F.3d at 249.

Thus, even though the standard does not set a high bar, it does require discussion of the significant probative evidence.  *See, e.g., Saez v. Colvin*, 216 F. Supp. 3d 497, 511 (M.D. Pa. 2016) ("[I]t is necessary for the Secretary to analyze all evidence. If she has not done so and has not sufficiently explained the weight given to all probative exhibits, 'to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'") (quoting *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979)); *Jean V. v. Saul*, No. 1:19-CV-00240, 2021 WL 1220619, at *7 (D. Idaho Mar. 31, 2021) ("More fundamentally, and as a separate instance of error, the ALJ's decision is not supported by substantial evidence in that it fails to discuss significant probative evidence. … It is not the ALJ's duty to discuss every piece

18

of evidence in the record – even every relevant piece of evidence. But it is the ALJ's duty to support his decision with record evidence, and he did not do so adequately here.").

In analyzing the entire record, the ALJ also has a responsibility to acknowledge and resolve conflicts in evidence. *See Richardson v. Perales*, 402 U.S. 389, 399, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) ("We therefore are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict."). Moreover, it is well-settled that an "ALJ may not pick and choose, without a good medical or other reason for doing so, those limited aspects of the record that he or she chooses, while rejecting other aspects of the record without an identifiable basis for doing so." *Jones v. Comm'r of Soc. Sec.*, No. 3:13-CV-019, 2014 WL 340427, at *4 (S.D. Ohio Jan. 30, 2014), *report and recommendation adopted in part, rejected in part*, 2014 WL 1050042 (S.D. Ohio Mar. 17, 2014).

Here, the ALJ's explanation for finding "less than marked" limitations in this domain can be summarized as follows: (1) the evidence submitted "does not show that the claimant's ability to care for his own needs has materially worsened"; (2) there is "no persuasive evidence" of marked or extreme limitations in this domain; (3) no medical source has said that he had marked or extreme limitations in this domain; (4) his mother described him as able to control his emotions during sporting events and outside of school; (5) he was described as "better" at self-regulating his emotions and caring; and (6) he can bathe and dress himself. (Tr. 21.)

While the ALJ generally states that he considered the entire record in making these findings, it is not possible to discern from the written decision itself whether the ALJ did consider the record as a whole. For example, the ALJ's only mention of E.C.L's years of psychiatric and behavioral health treatment at Beech Brook was a citation to a provider's observation in 2017 that E.C.L. had "shown improvement in focus/concentration and task

completion."  (Tr. 18 (citing Tr. 964); *see also* Tr. 21 ("The claimant has also been described as better at self-regulating his emotions").)  In doing so, the ALJ failed to acknowledge that the same record also noted E.C.L.'s continued struggles with impulsivity, his only occasional ability to use self-regulation skills, his inability to show self-regulation "across settings," and the "significant impact on his school functioning" of impulsivity and lack of focus/concentration. (Tr. 964.)  In limiting his discussion to that single record, the ALJ also failed to acknowledge behavioral health treatment records through 2020 which demonstrated that E.C.L. continued to receive treatment targeting impulsivity and self-regulation (Tr. 1219-75), with evidence of continued struggles with impulsivity and self-regulation in the school setting (Tr. 1223 (sent home from school again, awaiting school intervention), 1224 (struggled with impulsive reactions at school 3x in past 2 weeks), 1227 (struggling with emotional regulation in classroom), 1228-29 (has not been able to manage impulsivity at school and progress to be addressed by intervention team to avoid expulsion), 1234 (has new strategies to avoid defiance, dysregulation, and anger outbursts at school; willing to adopt new strategies to avoid suspensions at school), 1272 (noting suspension for fighting with peer and disrespect to teacher; taking private van to school due to excessive behavior problems coming on and off bus).)

With respect to the school intervention records, the ALJ does acknowledge that the ETR for the 2017 IEP found E.C.L. demonstrated significant difficulty with aspects of executive functioning in the areas of emotional regulation, flexibility, and inhibitory control.  (Tr. 17 (citing Tr. 977).)  However, he does not address the impact of this finding on his assessment of the caring for self domain.  (Tr. 21.)  He also does not address other observations and findings in the school records that appear relevant and potentially significant to an assessment of E.C.L.'s ability to self-regulate in the context of this domain.

For example, the ALJ does not acknowledge the 2018 IEP's discussion of interventions to address increased behavioral problems, safety concerns, rude/hurtful/bullying comments and actions, increased noncompliance in the classroom and resource room, and physically aggressive behavior. (Tr. 1105.) He does not address the 2018 IEP team's observation that E.C.L.'s behavioral difficulties impacted his academic performance, and that E.C.L. had "regressed significantly in his behavior over his fourth grade year." (Tr. 1109-11.) He does not address the team's note that E.C.L. had a history of difficulty self-regulating his emotional responses and worked "extensively" with outside therapy on strategies to calm himself, but was still only able to self-calm five times in the entire school year, or "5% of the time." (Tr. 1112.) The ALJ does not address findings in the 2019 IEP that E.C.L. continues to need support to manage his self-regulation behaviors in all classes, and when frustrated, angry, or not able to understand how to complete a task. (Tr. 789.) He does not address the additional provision of self-regulation supports in the 2019 IEP, such as checklists, movement breaks, drawing, pacing supervised by school staff, and door to door private van service to and from school. (Tr. 792.) He also does not address the finding in the 2020 IEP that E.C.L. was "not able to self-regulate independently in order to remain calm and make decisions when feeling upset or frustrated," and required up to five prompts to follow adult directives. (Tr. 843.) The 2020 IEP team also noted E.C.L. was observed speaking respectfully 57% of the time, talking out during instruction 71% of the time, and following rules and expectations 28% of the time in the hallway during 7 observations. (*Id.*)

The ALJ also does not address disciplinary records suggestive of significant difficulties self-regulating his behavior at school. Specifically, he does not discuss the twelve disciplinary incidents memorialized in E.C.L.'s 2017 IEP (Tr. 1134-38), additional behavior problems in 2017, 2018, and 2019 that resulted in suspensions (Tr. 277-84, 584-86, 663), behavior problems

and related disciplinary actions noted in detailed daily records from teachers in 2018 and 2019 (Tr. 701-18, 723-76), or the observation in the 2020 IEP that E.C.L. had been removed by school security in three separate incidents involving disruptive or noncompliant behaviors (Tr. 843).

It is observed that while fighting and violent behaviors do relate to the domain of interaction with others, they are also relevant to the domain of caring for self to the extent they demonstrate an inability to "avoid behaviors that are unsafe or otherwise not good for [him]."  20 C.F.R. § 416.926a(k)(2)(iv); *see, e.g., Abney o.b.o. C.K.S.*, 2021 WL 4451954, at *7-8 (assessing "acts of hitting, choking, and kicking peers and school staff, running from the building, and walking around the bus when it is moving" under both the domains of caring for self and interacting with others).  Many of the infractions documented in the records in this case – including walking out of class, refusal to work, calling out in class, throwing pencils, and falling asleep in class – are clearly relevant to E.C.L.'s ability to demonstrate consistent control over his own behavior.

The medical and school records summarized above suggest E.C.L. had difficulties with self-regulation that were not adequately managed by psychiatric treatment, counseling, or school interventions.  Indeed, his counseling records suggest that the interventions in early 2020, just before schools closed due to the COVID-19 pandemic, were specifically designed to prevent his expulsion from school.  (Tr. 1228-29.)  Because the ALJ did not acknowledge or address these records in his decision, the undersigned cannot conclude that his decision regarding the caring for self domain was supported by substantial evidence.  The ALJ held that the evidence did not show "material worsening" or "marked limitations" in E.C.L.'s ability to care for his own needs (Tr. 21), but did not explain how his findings were consistent with records suggestive of worsening behavior problems and difficulty with self-regulation that was uncontrolled despite

22

school interventions and private behavioral health services.  The ALJ also reported taking into consideration certain evidence suggestive of an ability to self-regulate emotions and care for himself (*id.*), but did not address how that evidence was weighed against the evidence discussed above, which is more suggestive of continuing limitations in that realm.

For all of the reasons set forth above, the undersigned finds that the ALJ's analysis of the record evidence was too limited to support a conclusion that he considered the record as a whole, and that his selective discussion of certain records failed to acknowledge conflicting evidence, thus depriving his decision of an "accurate and logical bridge" between the evidence and the result.  *Fleischer*, 774 F. Supp. 2d at 877.  The undersigned accordingly finds that the ALJ's finding that E.C.L. had "less than marked" limitations in the domain of caring for self was not supported by substantial evidence.

### VII. Conclusion

For the foregoing reasons, the final decision of the Commissioner is **VACATED** and **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Memorandum Opinion and Order.  On remand, the ALJ should consider the record as a whole in assessing whether E.C.L. functionally equals the listings, should accurately discuss the significant probative evidence, should resolve any conflicts in evidence, and should ensure that he builds an accurate and logical bridge between the evidence and the result.

October 12, 2022

*/s/Amanda M. Knapp*
_____
AMANDA M. KNAPP
United States Magistrate Judge